# FEDERAL DEPOSIT INSURANCE CORPORATION

v.

# LOUISIANA NATIONAL BANK.

### Civ. A. No. 77–165–A.

United States District Court,
M. D. Louisiana.

Jan. 24, 1980.

Earl S. Eichin, Jr., Barham & Churchill, New Orleans, La., for plaintiff.

Fredrick R. Tulley, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for defendant.

E. GORDON WEST, District Judge:

This case was tried before this court, sitting without a jury, on July 13, 1979. The litigation centered around the failure of the International City Bank of New Orleans (hereinafter ICB). ICB became insolvent on December 3, 1976 and was immedi-

ately taken over by the plaintiff, Federal Deposit Insurance Corporation (hereinafter FDIC).

The factual background is rather simple. On May 2, 1972, ICB offered Five Million dollars ($5,000,000.00) of Subordinated Senior Capital Notes to the public. The notes paid interest at the rate of 7½% and were due and payable no earlier than April 1, 1980. Louisiana National Bank (hereinafter LNB) purchased Five Hundred Thousand dollars ($500,000.00) worth of these notes.

In the Offering Circular which published these notes there was attached to, and made a part of, each note a "Note Agreement." This five page document contains, in paragraph No. 4, the provision which invoked this lawsuit:

"4. So long as any Notes are outstanding, this corporation shall not declare any dividends on its Common Stock unless, at the date of such declaration, in the case of a dividend the aggregate amount of all such dividends declared or made after April 1, 1972 would not exceed the net profits of this corporation earned after April 1, 1972."

At this juncture a diversion is in order. Paragraph No. 4 refers to ". . ., this corporation . . .." Throughout the Note Agreement the term which is used is "the Bank." It was brought out at the trial that ICB (the Bank) is a wholly owned subsidiary of ICB Corporation. Whether the reference to ". . ., this corporation . . ." is meant to be the Bank (ICB) or the corporation (ICB Corporation) is not absolutely certain. However, the Note Agreement was signed only by an officer of the Bank (ICB) and only for the Bank. Therefore, it must be presumed, and indeed it was not argued by either party to the contrary, that the Note Agreement and any references contained therein refer only to ICB as a Bank, and in no way imply any restrictions or limitations on the ICB Corporation.

Continuing, after LNB purchased some of these notes it monitored ICB with specific reference to the dividend restrictions. On March 23, 1976, Mr. Lawrence A. Merrigan, President of The Bank of New Orleans, wrote a letter to Mr. C. W. McCoy, President of Louisiana National Bank, advising him of a possible breach in the dividend covenant. (LNB Exhibit # 7). Mr. Merrigan attached several financial statements of both ICB and ICB Corporation. The letter contained the following statements:

"I have been unable to get the 1975 audited statement, however, I am attaching herewith a statement published on the bank as of December 31, 1975. You will note that during the year 1975 the existing $1,500,000 deficit of the bank increased to $1,735,000.

"So there can be no doubt that the bank, under the covenants of their loan agreement, could not declare and/or pay a dividend. In December the ICB Corporation (parent) did declare a cash dividend, payable in January, 1976. I am not aware of any basis for the holding company to have generated earnings sufficient to pay a dividend and it is conceivable to me, depending upon the manner in which this was handled, that the capital notes of the bank in accordance with the terms of the capital note agreement, might be in default. I am told that there will be considerable delay before the audited statement on the consolidated statement will be available to conclude positively the source of this dividend payment."

After receiving the letter from Mr. Merrigan, LNB directed a Registered Mail—Return Receipt Requested letter to ICB advising them of these circumstances. The pertinent portion of the registered letter stated:

"It is our opinion that an event of default has occurred through the declaration and payment of dividends and therefore in accordance with paragraph 5 (corrected subsequently to read paragraph 4) of the Note Agreement, we are hereby declaring the principal and any accrued interest on the above notes to be immediately due and payable. Please make the necessary arrangements to pay these notes in full plus accrued interest no later than 2:00 p. m. May 14, 1976."

Based on this letter alone LNB claims that it placed ICB in constructive default on the five senior capital notes. FDIC argues to the contrary. It must be added that LNB never attempted to offset the amount ICB had on deposit with LNB in the correspondent checking account against the amount allegedly due under the five senior capital notes. LNB's reason was that it hoped ICB could straighten out the problem and also, that LNB feared civil liability if, by taking over the correspondent account, any bank failure ensued. For these reasons, and others, LNB did not actually invoke the doctrine of compensation until after ICB had been closed by the Commissioner of Financial Institutions of the State of Louisiana. That is to say, ICB was officially closed by the Louisiana banking authorities on Friday, December 3, 1976. LNB invoked the Louisiana doctrine of compensation on Monday, December 6, 1976, when the FDIC demanded the full sum which ICB had on deposit with LNB in the correspondent checking account.

Naturally enough this litigation ensued. FDIC filed a complaint against LNB on May 20, 1977, in this court. After lengthy discovery and several motions the matter came on for trial before this court.

After an in-depth review of the record and the exhibits, the law and facts as argued by the parties, and the evidence that was presented at the trial, this court holds, for reasons hereinafter stated, that there be judgment rendered in favor of the plaintiff, FDIC, and against the defendant, LNB, in the sum of Three Hundred and Twenty-Three Thousand, Nine Hundred and Twenty-Four and 34/100 Dollars ($323,924.34) with legal interest at the rate of seven per cent (7%) per annum to run from the date of the entry of the judgment.

The events which LNB claims gave rise to the offset involve the declaration and payment of dividends in September of 1974 by ICB (the Bank). LNB alleges that these September of 1974 dividends caused ICB to violate condition number 4 of the senior capital note agreement. That is, it placed ICB in the position of having declared divi-dends in an aggregate amount that exceeded the aggregate amount of net profits of ICB since April 1, 1972.

The basis for LNB's allegation is a disagreement over the classification of the type of "accounting" transaction which should have been used in a previous ICB bookkeeping entry. It seems that the ICB Corporation was in need of funds. Between April and August of 1974, to fill this need, it sold several securities, i. e. stocks, to ICB at a price that was $789,000.00 in excess of the market price. The disagreement involves whether these securities transactions between the holding company (ICB Corporation) and the subsidiary (ICB) should have been recorded on ICB's books as a "dividend" or a "loan" to the ICB Corporation. Touche Ross & Co., ICB's regular certified public accountants, treated it as a "loan." Ernst & Whinney, LNB's regular certified public accountants, state that it should have been treated as a "dividend." Therein lies the main conflict which, along with others, has precipitated this litigation.

Based on the allegations in the complaint filed by FDIC, LNB defended this suit based on an affirmative plea that it was entitled to a set-off from the compensating balance in ICB's correspondent checking account with LNB. By alleging this affirmative defense LNB has placed itself in the position of bearing the burden of proof. *Federal Deposit Insurance Corp. v. Siraco*, 174 F.2d 360 (CA 2—1949); *Chicago Great Western Ry. Co. v. Peeler*, 140 F.2d 865 (CA 8—1944); and *Wright & Miller, Federal Practice & Procedure, Civil*, § 1271. In other words LNB does not vigorously contest the fact that it would be obligated to pay back the balance in the correspondent checking account if there were no default. However, LNB defends on the basis of a prior "default" by ICB on the senior capital notes. This causes the burden to shift to LNB to prove that there was, in fact, a default by ICB. This default must be in the form of ICB dividend payments exceeding net profits from the starting point of April 1, 1972. If LNB cannot prove, by a preponderance of the evidence,

that the ICB dividend declaration in September of 1974 was in direct violation of paragraph # 4 of the Note Agreement, then FDIC is entitled to the full amount of the balance which was in the ICB correspondent account with LNB; and LNB cannot rely on the Louisiana doctrine of compensation.

■ There are two areas which need developing to determine whether or not LNB has carried the affirmative defense of default, and whether they carried the burden of putting ICB in default. First we shall see whether or not there was a default by ICB on the senior capital notes.

The testimony at trial dealt with what may be termed a difference of opinion over an accounting entry. As was previously set out in the introduction, ICB bought securities from the ICB Corporation, its parent company. (It must be remembered that ICB was a wholly owned subsidiary of ICB Corporation.) ICB recorded part of the securities transaction as a "loan" since the price paid for the securities was far in excess of the market value. LNB argues that this securities overpayment should have been recorded as a "dividend" on the books of ICB. The logical progression of the LNB allegation is that this securities "dividend" then caused ICB to violate the provisions of the Note Agreement when ICB made a dividend declaration on September 9, 1974. For reasons to be explained hereafter, this court holds that ICB did *not* default on the senior capital notes.

There were two accounting experts called at the trial. Mr. Guy Cook, an accountant for Touche Ross (ICB's accounting firm), and Mr. William C. Coe, Jr., an accountant for Ernst & Whinney (LNB's accounting firm). The testimony of Mr. Cook established that the September, 1974 dividend is the only one that is questionable. From the beginning date of April 1, 1972, until December 31, 1973 the earnings, from which dividends could be paid, for ICB were $1,342,152.00. For this same period the dividends which ICB had paid out were $1,162,-784.00. This sets the stage for the 1974 year in which the alleged violative dividend

occurred. Based on the figures given ICB had $179,368.00 at the beginning of 1974 from which it could pay dividends and still not be in default on the senior capital notes.

The evidence adduced at trial established that as of September 9, 1974, the date when the Board of Directors for ICB declared the dividend, they had not violated paragraph 4 of the Note Agreement. That is, to the best of their knowledge, and with the appropriate financial statements to aid them, the ICB Board of Directors determined that they had excess profits and paid out a portion of those profits in dividends. According to the minutes of the meeting held on September 9, 1974, the Board of Directors unanimously approved a regular quarterly dividend of $.107 per share. The dividend was declared on September 9, 1974, it had a record date of September 20, 1974, and it was payable on October 4, 1974. This court concludes that on the date when the dividend was declared there was no violation of the dividend covenant. Therefore, no default under the terms of the Note Agreement.

LNB also alleges that there is proof of a default based on the contention that a subsequent FDIC bank examiner's report, which increased the loan loss reserves, indicates that ICB violated the Note Agreement. This is erroneous. Based on this examination and report ICB restructured its financial statement and later filed a standard Form 10–Q report with the Securities and Exchange Commission. The 10–Q report which had the advantage of the subsequent financial changes, would appear to indicate that ICB had violated the senior capital note restriction. However, this Court has determined that by taking a straight "chronological approach" to the ICB dividend situation no violation occurred which would have caused ICB to be in default on the notes.

The rationale is simple. At the time the ICB Board of Directors met to declare the dividend all of the financial records indicated that ICB could, in fact, pay out the exact amount of the declared dividend and not be in violation of paragraph 4 of the

Note Agreement. It was only the examination and audit report of an FDIC bank examiner which caused ICB to place an upward revaluation on their loan loss reserves. Keep in mind that the audit report was dated October 11, 1974, about five weeks after the Board of Directors meeting. Therefore, the audit report was of absolutely no use to the Board of Directors when it made its decision to declare a dividend.

The other LNB argument which is connected with the bank examiners report is that ICB indicated that it was in violation of the Note Agreement when it filed the Form 10–Q report. (LNB Exhibit No. 21). However, the information used in compiling this 10–Q report was accumulated subsequent to the September 9, 1974, Board of Directors meeting. The 10–Q report was dated November 13, 1975, over one year after the dividend declaration which LNB alleges placed ICB in default. The argument surfaced because in the 10–Q report ICB had access to the examiner's audit report and, therefore, in accordance with the examiner's order, increased the loan loss reserves. This made it appear that ICB had violated the dividend restriction. Such was not the case. The examination was conducted by the FDIC bank examiner on October 11, 1974, which was long after the Board of Directors had declared the dividend. The audit was even conducted seven days after the dividend had actually been paid. Thus, ICB was, at the time it declared, recorded and paid the September, 1974 dividend, in full compliance with paragraph 4 of the Note Agreement. It was only subsequent events which made it appear that ICB had violated the dividend restriction.

Since this court has determined that there was no violation of the dividend restriction, and therefore no default, there is no need to discuss the issue of whether LNB properly placed ICB in default. That point becomes moot. However, this court does comment that it is highly unlikely that LNB properly placed ICB in default. This is so, due to the large volume of transactions which were allowed to occur in the correspondent checking account which ICB maintained with LNB.

Accordingly, there shall be a judgment entered in favor of the Federal Deposit Insurance Corporation, and against the Louisiana National Bank in the amount of Three Hundred and Twenty-Three Thousand, Nine Hundred and Twenty-Four and 34/100 Dollars ($323,924.34) with legal interest at the rate of seven per cent (7%) per annum to run from the date of the entry of the judgment. The court, after due consideration, rejects the claim of the plaintiff that interest should begin to run at an earlier date.